UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIACRISTINA BONILLA on behalf of herself and all others similarly situated,<br><br>                              Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC,<br><br>                              Defendant. | **No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Mariacristina Bonilla ("Plaintiff") brings this class action on behalf of herself and all others similarly situated against defendant Amazon.com, Inc. The allegations are based upon the investigations of counsel, personal knowledge with respect to Plaintiff, and information and belief.  Plaintiff alleges the following:

## I.      INTRODUCTION

1.      Defendant Amazon.com, Inc. ("Amazon") operates the world's largest online retail platform.  Online sales by Amazon account for nearly half of all retail e-commerce in the United States[1] and in particular it has accounted for 76% of all digital book sales in the United States.[2]

2.      The five largest book publishing companies that dominate the publishing industry are Hachette Book Group; Simon & Schuster, Inc. and Simon & Schuster Digital Sales, Inc.; HarperCollins Publishers L.L.C.; Penguin Random House LLC; and Macmillan Publishing Group, LLC (collectively known as the "Big Five").  The Big Five produce "trade books," which include

---

[1] Amazon Now Has Nearly 50% of US Ecommerce Market, Emarketer (Jul. 16, 2018), https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.
[2] Jeffrey A. Trachtenberg and Dana Mattioli, Connecticut Investigating Amazon's EBook Business, Wall Street Journal (Jan. 13, 2021).

"general interest fiction and non-fiction books," as opposed to "'non-trade' books such as academic textbooks, reference materials, and other texts."[3]  The Big Five make up 80% of domestic trade book sales.[4]

      3.     Plaintiff and Class members are consumers who frequently shop for electronic books ("eBooks") published by the Big Five through online retailers such as Amazon, Kobo, Apple Books, and Barnes & Noble.  The Big Five sell their books through these platforms under an "agency model" in which every sales transaction occurs directly between the publisher and retail consumer while the online platform serves as the publisher's sales agent taking a commission on each book sold.[5]

      4.     Plaintiff and Class members purchased one or more eBooks directly from the Big Five through a retail platform other than Amazon's.  Plaintiff alleges that Amazon and the Big Five agreed to price restraints that cause Plaintiff and Class members to pay supracompetitive prices for eBooks purchased from the Big Five through a retail platform other than Amazon.com.

      5.     Since 2011, the United States and European antitrust authorities have continuously investigated eBook prices.  The European Commission ("EU Commission") first investigated potential collusion between the Big Five and Apple in 2011.[6]  Additionally, the Department of Justice ("DOJ") along with the Attorneys General from at least 33 states filed a civil action against Apple and the Big Five in 2012.[7]  The EU Commission as well as the U.S. District Court presiding

---

[3] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 n.4 (S.D.N.Y. 2013).
[4] Constance Grady, Milo Yiannopoulos's book deal with Simon & Schuster, explained, Vox (Jan. 3, 2017), https://www.vox.com/culture/2017/1/3/14119080/milo-yiannopoulos-book-dealsimon-schuster-dangerous-boycott.
[5] Grady, CASE AT.40153 EBook MFNs and related matters (Amazon), https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4392_3.pdf ("5.4.2017 EU Commission Decision") at 8.
[6] 5.4.2017 EU Commission Decision at 8.
[7] House Report at 333; 5.4.2017 EU Commission Decision at 8.

over the DOJ and AG's lawsuit determined that the Big Five had colluded with Apple to raise retail eBook prices.[8]  The agreement between the parties was to shift from a wholesale model (where the eBook retailer sets retail prices) to an agency model (where the publisher sets retail prices and the eBook retailer acts merely as its agent).[9]  The Big Five entered into most favored nations ("MFN") clauses with Apple requiring that the Big Five sell their eBooks at the same prices via Apple's online store as well as all other eBook retailers (including Amazon) as a part of their conspiracy.[10]

6.      In 2012 and 2013 respectively, the U.S. District Court entered consent decrees against the Big Five while the EU Commission entered settlements as well.[11]  Both the consent decrees and the settlements required the Big Five to cease from colluding with one another, to refrain from MFNs in any of their agreements with eBook retailers for five years, and to allow eBook retailers to implement their own discounts to retail prices on the Big Five's eBooks for two years.[12]

7.      As a result, the Big Five's eBook prices decreased dramatically from 2013-2014 while the decrees were in effect.  In 2015, prices rose  after the Big Five renegotiated their agency agreements with Amazon and the Big Five have since continued to maintain supracompetitive prices.

---

[8] *Apple Inc.*, 952 F. Supp. 2d at 648; 5.4.2017 EU Commission Decision at 8.
[9] *Id.*
[10] *Id.*
[11] *See U.S. v. Apple Inc., et al*., Department of Justice, https://www.justice.gov/atr/case/us-vapple-inc-et-al; 5.4.2017 EU Commission Decision at 8 n.11.
[12] 5.4.2017 EU Commission Decision at 8; see, e.g., Final Judgment as to Defendants The Penguin Group, a Division of Pearson PLC, and Penguin Group (USA), *United States v. Apple Inc.*, Case No. 12-cv-02826-DLC (S.D.N.Y.), Docket No. 259 ("Final Judgment Penguin"), at 8 https://www.justice.gov/atr/case-document/final-judgment-defendants-penguin-group-divisionpearson-plc-and-penguin-group-usa.

8.     Amazon publicly stated that it was negotiating with the Big Five with the expectation of continuing to discount eBook prices after the two-year period required by the consent decree; however, this did not happen, and the Big Five increased eBook prices. Co-conspirator Penguin raised its eBook prices by 30.4%, co-conspirator HarperCollins by 29.3%, co-conspirator Simon & Schuster by 15.8%, co-conspirator Hachette Book Group by 8.3%, and co-conspirator Macmillan by 10.7% after announcing their respective agency contracts with Amazon.

9.     The Big Five co-conspirators boosted prices by increasing the price point for new releases and reducing the number of price ranges into which the consolidated eBook prices would be placed. During the Big Five's conspiracy with Apple, eighty percent of their eBooks fell within four price ranges. During the DOJ consent decrees this number doubled; however, after entering into agreements with Amazon once the decrees were lifted, the Big Five reverted back to using three or four price ranges by 2018 and through the present.

10.    In 2014, the Big Five's eBook prices were at their most varied point during the decrees. When adjusted for inflation, eBook prices sat around $12 and only about five percent of titles sold around $15. Conversely in 2020, fifty-five percent of titles were sold for around $15 and less than five percent were sold for about $12.

11.    If Amazon and the Big Five co-conspirators exclusively raised prices for Amazon eBooks, consumer would be free to shop for competitively-priced eBooks on other online retail platforms. Instead, Amazon and its co-conspirators agreed to price restraints that would prevent that from happening.

12.    The EU Commission opened another investigation into eBook pricing in June 2015 and determined that Amazon used MFNs in its agreements with the Big Five co-conspirators, despite them being precluded from agreeing to MFNs by their earlier settlements with the EU

Commission.[13]  EU Commission found these provisions between Amazon and the Big Five to be much too analogous to the previous issues causing anticompetitive effects.[14]  A settlement was reached in 2017 prohibiting Amazon from enforcing MFNs and other similar provisions for five years.[15]  This settlement did not cover Amazon's agreements with the Big Five in the United States.

13.     In 2019, the House Judiciary Committee began investigating Amazon as a part of a broader investigation into competition in digital markets.[16]  The Committee concluded that Amazon's use of MFN provisions in its agreements with book publishers harms competition in the retail book market, including in particular the eBook market.[17]  The House Report found that "Amazon's dominance in e-books and its anticompetitive application of price parity clauses to its business relationships in this market eliminates the ability of rivals or new entrants to gain any meaningful competitive advantage relative to Amazon."[18]

14.     The Big Five  received subpoenas in 2019 pursuant to another investigation in Connecticut that also focuses on Amazon's relationships with publishers.[19]

15.     Consumers do not significantly benefit from the cost reductions that result from low printing and distribution expenses associated with eBooks as opposed to print books.  Amazon charges high commissions and other fees to publishers, including the Big Five, which substantially raises retail prices for eBooks sold by Amazon.[20]  Amazon raises the cost of selling eBooks by

---

[13] 5.4.2017 EU Commission Decision at 4-5.
[14] *Id*. at 20-38, 43.
[15] *Id*. at 39, 41-42.
[16] House Judiciary Committee, Investigation of Competition in Digital Markets, Oct. 5, 2020, at 6, https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf ("House Report").
[17] *Id.* at 295.
[18] *Id.* at 296.
[19] *See* Trachtenberg and Mattioli, *supra* n.2.
[20] Letter from Maria A. Pallante, Pres. & CEO, Ass'n of Am. Publishers, Mary E. Rasenberger, Exec. Dir., Authors Guild, Allison K. Hill, CEO, Am. Booksellers Ass'n, to Hon. David. N.

tying its distribution services (giving consumers their desired books on Amazon's retail platform, processing payments, distributing the purchased eBooks) to its marketing and advertising services, which are designed to strategically place advertisements for consumers on its online platform.[21] Furthermore, Amazon increases the Big Five's selling costs by manipulating eBook "discovery tools to make a publisher's books difficult to find without the purchase of advertising or refuses distribution unless the publisher also purchases advertising."[22]

16.     Through Amazon's required MFNs, Amazon is granted pricing, terms, and conditions equal to or better than those offered to Amazon's competitors, and Amazon requires sellers to notify Amazon about such terms, thereby restricting discounts to consumers, and stifling innovation in the trade eBook market.[23]

17.     In a competitive market, the Big Five could sell eBooks at lower prices on their own online platforms or via Amazon's competitors that offer lower commissions and fees. Nonetheless, they have agreed with Amazon to not do that.  This restrains Amazon's competitors from expanding their shares of the market and minimizes the incentive for new competitors to enter the market.[24] Defendant Amazon and the Big Five co-conspirators entered into these anticompetitive agreements with the purpose and effect of injuring consumers by eliminating competitive pricing that Amazon would otherwise face, and increasing eBook prices sold through Amazon's retail competitors above competitive levels.

---

Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Aug. 17, 2020), https://publishers.org/wp-content/uploads/2020/08/Joint-Letterto-Rep-Cicilline-081720.pdf.

[21] *Id*. at 2.

[22] *Id*. at 3.

[23] *Id*. at 7.

[24] House Report at 295.

18.     Since Amazon and the Big Five co-conspirators have not made the exact terms of their agreements public, Plaintiff relies on public disclosures and investigations including news reports, submissions to the House Judiciary Committee and the findings of the EU Commission and House Judiciary Committee.  These reports describe generally the contractual arrangements that Amazon uses in its agreements with publishers to prohibit competition from other eBook retailers.

19.     MFN agreements usually entitle a buyer to pricing and/or terms that are equal or better than those a seller offers to any other buyer.  Amazon's contracts with the Big Five are instead a hybrid of MFNs and the agency model.  The Big Five co-conspirators depend on the agency model to sell eBooks, therefore Amazon is not a buyer and the Big Five are not its suppliers. "Amazon," the House Judiciary Committee observes, "has a history of using MFN clauses to ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[25]

20.     While Amazon has abstained from using the term "most favored nation," the Judiciary Committee concluded that Amazon has continuously imposed on book publishers contract provisions that effectively function as MFNs, despite the current agency model.[26] Amazon uses these stipulations to prevent "publishers from partnering with any of Amazon's competitors" and to strengthen "Amazon's 'stranglehold' and 'control' over book distribution."[27] Due to Amazon's market power in the retail eBook market, these contractual requirements prevent Amazon's actual and potential retail competition from implementing alternative business models,

---

[25] *Id.*
[26] *Id.*
[27] *Id.*

offering promotional advantages, or offering customers lower pricing on their own.[28]  The House Judiciary Committee's findings are consistent with the previous conclusions of the EU Commission.[29]

21.     The EU Commission's findings regarding Amazon's MFN practices divided them into five separate categories.

22.     First, the EU Commission found that Amazon uses "business model parity clauses" in its contracts with the Big Five and other eBook publishers.[30]  These clauses require the Big Five to alert Amazon of the distribution of their eBooks through other business models, and offer Amazon the same material terms and conditions, even if the competing online retailer operates under a different business model.[31]  Different business models include subscriptions, streaming, rentals, book clubs, bundling eBooks with print books, and reduced pricing for partial downloads.[32] This clause causes a debilitating disincentive for the Big Five to support or invest in innovative business models that might result in greater competition and lower prices.[33]  Additionally, it disincentivizes Amazon's eBook competitors from developing such models.[34]  It can even prevent the entry of new eBook retailers or the expansion of existing competitors, which in turn reduces competition in the eBook retail market, and strengthens Amazon's dominant position.[35]

23.     Second, Amazon implemented, and the Big Five co-conspirators agreed to, "selection parity clauses."[36] Because of Amazon's eBook market dominance, its retail competitors

---

[28] *Id*. at 295-296.
[29] 5.4.2017 EU Commission Decision.
[30] *Id*. at 9, 12, 22-26.
[31] *Id*. at 9, 22.
[32] *Id*. at 9.
[33] *Id*. at 22.
[34] *Id*. at 9.
[35] *Id*.
[36] *Id*. at 27-31.

need to provide additional value to consumers, for example in the form of differentiated content or early releases of eBooks because even temporarily offering content that is unavailable on Amazon would increase competition in the retail distribution of eBooks.[37] In a competitive market, the Big Five would have a financial incentive to incur the added investment cost of developing innovative products for exclusive release by Amazon's retail competitors or to offer them exclusive early releases, so that Amazon's competitors would gain market share and weaken Amazon's bargaining power over the Big Five.[38] These clauses force the Big Five to offer Amazon parity with its competitors with respect to: (i) any eBook available within a particular geographic territory; (ii) any particular date and time for an eBook's release; and (iii) any feature, functionality, usage rule, element or content for one of more eBooks.[39]

24.     The EU Commission determined such clauses posed serious threats to market competition in a number of ways.[40] They minimized any incentive for Amazon's competitors to develop and innovate features and functionalities of eBooks.[41] They also thwarted development and innovation in eBooks and eReaders.[42] Amazon's selection parity clauses harm consumers by eliminating publishers' incentive to develop new eBook functionalities.[43] It hurts retail competition because it stifles a significant avenue for retailers to compete with Amazon by supporting such functionalities.[44]

---

[37] *Id*. at 30.
[38] *Id*. at 29-30.
[39] *Id*. at 27.
[40] *Id*. at 27-31.
[41] *Id*. at 27.
[42] *Id*. at 28-29.
[43] *Id*.
[44] *Id*. at 31.

25.     Third, Amazon required "retail price parity" provisions in the agency contracts with the Big Five.[45]  These price parity clauses required: (i) the agency price parity clause; (ii) the discount pool provision; and (iii) the promotion parity clause.[46] When the Big Five renegotiated their contracts with Amazon in approximately 2015, the consent decrees prevented them from having MFNs in their eBook contracts. Until about 2017, while they were still subject to this prohibition, Amazon and the Big Five agreed to notification provisions that served the same function as the prohibited MFN provisions (i.e., Amazon's agency price parity, promotion price parity, discount pool, wholesale price parity and agency commission parity provisions discussed below).

26.     The agency price parity clause required the Big Five to set retail pricing on Amazon that is no higher than the pricing charged by Amazon's competitors.[47]

27.     The promotion parity clause prohibited the possibility that the Big Five co-conspirators might temporarily set lower retail prices on the platform of any Amazon eBook competitor, unless they offered an equivalent promotion to Amazon.[48]

28.     Similarly, the discount pool provision provides Amazon the ability to set discounted prices that are equal or less than the cheapest retail price of any eBook distributed by a publisher to Amazon's competitors.[49]

29.     The EU Commission found that Amazon's retail price parity provisions in the contracts with the Big Five limited the ability of Amazon's competitors "to attract buyers by offering lower retail prices than those on Amazon.  This may discourage competing E-book

---

[45] *Id*. at 32.
[46] *Id*.
[47] *Id*.
[48] *Id*.
[49] *Id*.

Retailers from entering in the first place."[50]  The Commission found that these arrangements were likely to reduce competition between eBook online retailers by reducing the incentive of Amazon's eBook competitors to compete by offering lower rates of agency commission.[51]  In fact, such arrangements actually incentivize Amazon to charge higher commission rates, as eBook suppliers have no ability to draw customers away from Amazon to its competitors based on commission or retail price.[52]

30.     Amazon's retail price parity provisions functioned like MFNs in that they allowed Amazon to prevent its competitors from undercutting the Big Five's eBook pricing on Amazon.[53]  When Amazon is alerted that one of its co-conspirators' eBooks is available at a lower price, Amazon usually requests to be charged the same price on Amazon.[54]  Should a publisher not comply, Amazon would retaliate or threaten to retaliate by disabling purchases of the publisher's eBooks on its platform, by excluding the publisher from any promotional or discount activity, eliminating the pre-order buttons from the publisher's eBooks, or by increasing advertising for another publisher's eBooks.[55]  Ultimately, the Big Five were forced to stop entering into promotions with Amazon's competitors.[56]  These parity provisions are anticompetitive as they eliminate any incentive for the Big Five co-conspirators to offer better pricing or terms to Amazon's competitors or future competitors.[57]

---

[50] *Id*. at 33.
[51] *Id*. at 34.
[52] *Id*.
[53] *Id*. at 36.
[54] *Id*.
[55] *Id*. at n.55.
[56] *Id*. at 37.
[57] *Id*.

31.     The conclusion of the EU Commission's investigation resulted in an agreement for Amazon not to enforce MFNs or other similar provisions for five years.  One Commissioner stated this would "open the way for publishers and [booksellers] to develop innovative services for e-books, increasing choice and competition to the benefit of European consumers."[58]

32.     Amazon and the Big Five continue to use MFNs and other similar anticompetitive provisions in the United States.  Despite multiple investigations and censures, the conspiracy to fix, raise, maintain, or stabilize the prices of eBooks in violation of Section 1 of the Sherman Act has not halted between Amazon and the Big Five. From about 2017 through the present, the consent decrees no longer prohibited MFNs in the Big Five contracts. Rather than relying on the notification provisions, it is believed that Amazon and the Big Five agreed to some or all of Amazon's MFN provisions (i.e., Amazon's agency price parity, promotion price parity, discount pool provision, wholesale price parity and agency commission parity provisions discussed below).[59]

33.     **Agency price parity**: Currently and since at least 2015, in the United States the Big Five have agency agreements with Amazon.[60] The EU Commission reports that Amazon's contracts with publishers that operate under the agency model include an agency price parity provision.[61] The agency price is the price the Big Five publisher sets or, if discounting is permitted, the discounted price charged by an eBook retailer for the sale of an eBook to a consumer under an agency agreement.[62] The agency price parity provision requires the Big Five to set the eBook price

---

[58] *Id*.

[59] See House Report at 295 ("Although Amazon has changed the name and specific mechanisms over the years, it appears that the company continues to impose contract provisions that effectively function as MFNs on book publishers.").

[60] See infra n.5.

[61] 5.4.2017 EU Commission Decision at 32.

[62] *Id*. at 10 n.17.

for books they sell through Amazon no higher than the eBook price charged on eBook retail platforms that compete with Amazon.com. This clause harms consumers by increasing Amazon's dominance as the platform for the Big Five's eBook sales and raising the Big Five's eBook prices. If this clause did not exist, the Big Five would have a financial incentive to lower their eBook prices on rival platforms that charge lower commissions than Amazon and steer more sales to those platforms, thereby increasing the publishers' overall revenues and profits and evading Amazon's "stranglehold" over them.[63] The Big Five co-conspirators also have an agency commission parity clause that requires the Big Five to provide Amazon a commission that is equal to or greater than the commission the Big Five pay to Amazon's retail competitors, so conversely the Big Five cannot diversify their distribution channels by offering Amazon's competitors a better commission.[64]

34.     **Promotion price parity:** Agency agreements also include a promotion price parity clause that requires the Big Five to provide Amazon any promotional agency price, promotional wholesale price, or promotional content that they offer to any other eBook retailer. The clause is anticompetitive because it gives the Big Five an incentive to prohibit Amazon's retail rivals from offering promotional eBook prices.[65]

35.     **Discount pool:** The discount pool clause provides Amazon yet another way to enforce its MFN whenever a competing eBook retailer offers a lower retail price than the publisher's price on Amazon.com.[66] The clause relates to a "pool" of credits that Amazon may use at its discretion. If any eBook the publisher sells triggers this clause, Amazon may discount the

---

[63] *Id*. at 34; House Report at 295.
[64] *Id.* at 11.
[65] *Id.* at 32. Amazon also has a wholesale price parity clause with publishers that sell at wholesale. This clause ensures that the publisher cannot offer Amazon the same title on the same date for a higher wholesale or retail price. *Id*. at 30. However, the Big Five have agency agreements with Amazon.
[66] *Id*. at 35 n.54.

agency price for that title or any other eBook title the publisher sells on Amazon.com.[67] Defendant calculates the pool based on the differences between the agency prices the Big Five charge for their eBooks on Amazon.com and any lower prices available through any other eBook retailer.[68] It then multiplies the difference in price by the number of units sold through Amazon for the duration of the time that the price on Amazon exceeded the competitor's price.[69] This clause is anticompetitive because it prevents Amazon's retail rivals from competing on price and eliminates the discounts that would otherwise be available to consumers.

36.    Amazon and the Big Five's agreements is an unreasonable restraint of trade that prevents competitive pricing, limits innovation, and imposes overcharges on Plaintiff and other Class members when they purchase the Big Five's eBooks from one of Amazon's online eBook competitors.  Plaintiff therefore seeks, in addition to compensatory damages, injunctive relief under the Clayton Act to prevent Amazon and the Big Five from enforcing these restraints.

37.    Amazon also maintains monopoly power in the market for domestic retail trade eBooks.  Amazon has willfully obtained that monopoly power through anticompetitive conduct, fixing the pricing of trade eBooks at supracompetitive levels on both its own platform and the platforms of its competitors.  Such conduct is an abuse of monopoly power in violation of Section 2 of the Sherman Act.

38.    Plaintiffs seek injunctive relief and monetary recovery under the Clayton Act for all overcharges incurred by the Class.

---

[67] *Id.* at 32.
[68] *Id.*
[69] *Id*. at 35.

## II.      PARTIES

39.      Mariacristina Bonilla is a resident of Norwalk, Connecticut.  Ms. Bonilla purchased numerous books published by the HarperCollins, Penguin, and Macmillan from Barnes & Noble during the proposed class period.

40.      Defendant Amazon is an online retailer with its principal place of business in Seattle, Washington with facilities and employees operating throughout the United States. Amazon is vertically integrated and is active upstream as a publisher, with its own imprints, but also downstream as an eBook retailer.  Amazon sells eBooks and eBook read subscriptions to its retail consumers in New York and throughout the United States through its Amazon.com platforms.  Amazon also owns Amazon Publishing, which publishes books and competes with the Big Five publishers.

### Co-Conspirators

41.      Co-conspirator Hachette Book Group, Inc. ("Hachette") is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of Lagardère Group, a French conglomerate. Its imprints include, among others: Center Street; FaithWords; Grand Central Publishing (formerly Warner Books); Little, Brown and Company; Orbit; Perseus Books; and Worthy.

42.      Co-conspirator HarperCollins Publishers L.L.C. ("HarperCollins") is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of News Corporation. Its imprints include, among others: Avon; Caedmon; Ecco; Harlequin Books; Walden Pond Press; and William Morrow.

43.      Co-conspirator Macmillan Publishing Group, LLC ("Macmillan") is a New York corporation with its principal place of business in New York, New York. It is a subsidiary of Holtzbrinck Publishing Group, a German conglomerate. Macmillan operates eight divisions in the

United States: Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company; Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press and Tor/Forge.

44.     Co-conspirator Penguin Random House LLC ("Penguin") is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of Bertelsmann SE, a German conglomerate. Its imprints include: Alfred A. Knopf; DK; Doubleday; Penguin; Putnam; Random House; Viking Books; and Vintage Books.

45.     Co-conspirator Simon & Schuster, Inc ("Simon & Schuster") is a New York corporation with its principal place of business in New York, New York. It is a subsidiary of ViacomCBS Inc. Its imprints include: Beyond Words Publishing; Folger Editions; Gallery Books; MTV Books; Pocket Books; and Scribner. On November 25, 2020, ViacomCBS Inc. announced plans to sell Simon & Schuster to Bertelsmann SE, Penguin's parent company. The proposed transaction "would create a publishing behemoth accounting for about a third of all books sold in the U.S."[70]

### III.     JURISDICTION

46.     This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act and Clayton Antitrust Act, 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

47.     This Court has personal jurisdiction over Defendant under Section 12 of the Clayton Act, because Amazon resides in this District or may be found or transact business in this District. Amazon has over 8,000 employees in its New York City work force, including many who

---

[70] Benjamin Mullin and Jeffrey A. Trachtenberg, *Penguin Random House Parent to Buy Simon & Schuster From ViacomCBS*, Wall Street Journal (Nov. 25, 2020).

work at its Manhattan office space.[71] It has five warehouses in New York, including two in Manhattan.[72] It also owns and operates four Amazon Books stores and eight cashier-free Gostores in locations throughout Manhattan.[73] Amazon has eight office properties in Manhattan, most of which are clustered in Midtown, including the iconic Lord & Taylor building on Fifth Avenue.[74]

48.     Exercising personal jurisdiction is also appropriate under Section 302(a) of New York's long-arm statute because Amazon transacts business in the State of New York, directly or through agents, such that it has sufficient minimum contacts with New York. In addition to business it transacts in New York City, Plaintiff avers on information and belief that Amazon's sales to its customers in New York State represent at least 5% of Amazon's U.S. sales and therefore rise to the level of substantial solicitation necessary to satisfy the minimum contacts required to support this Court's exercise of personal jurisdiction over Amazon.

---

[71] Ed Shanahan, Amazon Grows in New York, Reviving Debate Over Abandoned Queens Project, NYT (Dec. 9, 2019), https://ww, w.nytimes.com/2019/12/06/nyregion/amazon-hudsonyards.html.
[72] https://en.wikipedia.org/wiki/List_of_Amazon_locations#United_States ; Ben Fox Rubin, Why Amazon built a warehouse inside a Midtown Manhattan office tower, CNET (Dec. 21, 2015), https://www.cnet.com/news/why-amazon-built-a-warehouse-inside-a-midtownmanhattan-office-tower/.
[73] Where are Amazon Go stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+go+stores+in+new+york&qs=NW&pq=where+are+amazon+go+stores+in+new+&sc=5-34&cvid=29EA099E9F8E4797A844A8DCA5842069&FORM=QBLH&sp=1&ghc=1; Where are Amazon Books stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+books+stores+located+in+new+york%3F&cvid=1f533e8508ec4a378125b0ed5e3fc0cb&FORM=ANAB01&PC=U531.
[74] Matthew Haag, Manhattan Emptied Out During the Pandemic. But Big Tech Is Moving In. NYT (Nov. 9, 2020), https://www.nytimes.com/2020/10/13/nyregion/big-tech-nyc-officespace.html.

## IV.    VENUE

49.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because the Big Five reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

## V.    CLASS ACTION ALLEGATIONS

50.     Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this action on behalf of herself and the members of a Class defined as follows:

> All persons in the United States who, on or after January 14, 2017 purchased one or more eBooks sold by the Big Five publishers through any other online retail platform in the United States other than the Amazon.com platform.

51.     Excluded from the Class are the Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the judge presiding over this action; his/her law clerks and spouse; any persons within three degrees of relationship to those living in his/her household; and the spouses of all such persons.

52.     **Numerosity:** Members of the class are so numerous that joinder is impracticable. Plaintiff believes that the Class is numerous and geographically dispersed throughout the United States such that joinder of all Class members is impracticable. Further, the class is readily identifiable from information and records maintained by Defendant's co-conspirators.

53.     **Typicality:** Plaintiff's claims are typical of the claims of the Class members. Plaintiff's interests are not antagonistic to the claims of the other Class members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate. Plaintiff and Class members were damaged by the same wrongful conduct of Defendant.

54. **Adequate representation:** Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

55. Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law.

56. **Commonality:** Questions of law and fact common to Class members predominate over questions that may affect only individual Class members because the Defendant and its co-conspirators have acted on grounds generally applicable to the entire Class, thereby determining damages with respect to the class as a whole is appropriate. Such generally applicable conduct is inherent in Defendant's and its co-conspirators' wrongful conduct.

57. The common legal and factual questions, which do not vary from Class member to Class member and that may be determined without reference to individual circumstances of any Class member, include, but are not limited to, the following:

    i.   Whether Amazon and its co-conspirators unlawfully conspired to unreasonably restrain trade in violation of federal antitrust laws;

    ii.   whether Amazon has unlawfully monopolized the domestic retail eBook market, including by way of the conduct described herein;

    iii.   whether competition in the domestic retail eBook market has been restrained and harmed by Amazon's monopolization of the market;

    iv.   injury suffered by Plaintiff and members of the Class;

    v.   damages suffered by Plaintiff and members of the Class;

vi.     whether Amazon has acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole; and

vii.    the nature and scope of injunctive relief necessary to restore a competitive market.

58.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Class treatment will permit a larger number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in management of this class action.

59.     Plaintiff knows of no specific difficulty that would preclude the maintenance of this case as a class action.

## VI.     FACTUAL ALLEGATIONS

### A.     The Big Five's Dominance in the Market for Trade Book Publication

60.     The market in eBook trade books is defined by the trade publishers that produce them. The Big Five publish many of the most popular authors and books in fiction and non-fiction, including a large majority of the New York Times bestsellers.[75]  Their dominance is attributable

---

[75] *United States v. Apple Inc.*, 791 F.3d 290, 298 (2d Cir. 2015).

primarily to a long history of mergers and acquisitions that has resulted in their acquiring subsidiary publishers or "imprints," as described in the charts below[76]:

Penguin[77]:



---

[76] Peter Lee, *Reconceptualizing the Role of Intellectual Property Rights in Shaping Industry Structure*, 72 Vand. L. Rev. 1197, 1259-1263 (May 2019).

[77] 0 The Big Five US Trade Book Publishers, Almossawi (June 20, 2016), https://almossawi.com/big-five-publishers [https://perma.cc/W49V-PEGP].

HarperCollins[78]:



Macmillan[79]:



Simon & Schuster[80]:

---

[78] *Id.*

[79] *Id.*

[80] *Id.*



Hachette[81]:



61.     HarperCollins began as J. and J. Harper in 1817 before eventually becoming Harper

& Row.[82]  Hachette began in America as Little, Brown and Company in 1837.[83]  During the 1920s,

Penguin acquired numerous independent publishers such as Viking and Putnam.[84]  In 1924, Simon

---

[81] *Id.*

[82] Peter Lee, *Reconceptualizing the Role of Intellectual Property Rights in Shaping Industry Structure*, 72 Vand. L. Rev. 1197, 1259 (2019).

[83] *Id.*

[84] *Id.* at 1259-60.

& Schuster was established and has been owned by a variety of companies including Viacom and CBS Corporation.[85]  Publishing was then scaled down to a few powerhouses by the 1950s.[86]

62.     Consolidation of publishing companies has continued over the years and spiked in the 1980s, during which there were fifty-seven major publishing acquisitions just between November 1985 and November 1986.[87]  By 2006, the six largest U.S. trade book publishers (currently the Big Five) combined for ninety percent of total sales.[88]  After the merger of Penguin and Random House in 2013, the combined group controls an estimated twenty-five percent of the English-language publishing market.[89]

63.     Trade publishers continue to lose business and are unable to compete with the Big Five.  Houghton Mifflin is now considering the sale of its trade publishing division, potentially to Macmillan or Hachette.[90] On November 25, 2020, Penguin announced plans to acquire Simon & Schuster. The proposed merger would create a single publishing house representing approximately a third of all trade books published.[91] News Corp Chief Executive Robert Thomson said in a

---

[85] *Id*.; Alexandra Alter and Edmund Lee, *Penguin Random House to Buy Simon & Schuster*, NYT (Nov. 25, 2020), https://www.nytimes.com/2020/11/25/books/simon-schuster-penguinrandom-house.html.

[86] *Supra* Lee.

[87] *Id*.

[88] *Id*.

[89] *Id*. at 1262.

[90] *See supra*, Alter & Lee.

[91] AG Statement on Proposed Sale of Simon & Schuster and Its Ramifications for Authors, The Authors Guild, https://www.authorsguild.org/industry-advocacy/ag-statement-on-proposedsale-of-simon-schuster-and-its-ramifications-for-authors/; Frank Jordans and Hillel Italie, Penguin to buy Simon & Schuster, create publishing giant, Associated Press (Nov. 25, 2020), https://apnews.com/article/stephen-king-publishing-john-irving-media-jonathan-karp89ec475bd7783fea199a378c60261f8b.

statement. "This literary leviathan would have 70% of the U.S. literary and general fiction market."[92]

### B.    Amazon's Dominance in the Market for the Retail Sale of Trade Books

64.    Amazon continues to sell more books than any single retailer in history.[93]  Before Amazon entered the eBook market, there were roughly 4,000 independent bookstores in the United States.[94]  That number has now decreased to less than two thousand, and Amazon's market power has increased accordingly.[95]  Barnes & Noble, the second largest retail bookseller, has  closed 150 outlets over the last ten years.[96]  Additionally, Borders Group, Inc. was forced to cease operations after operating nearly 700 retail outlets.[97]

65.    Amazon's rise in the book industry is even more pronounced in the eBook market, where it enjoys nearly 90% of the market and its closest competitor, Apple, has a distant 6% share.[98] One way Amazon separates itself from its competition is by appealing to a client's existing or analytically predicted needs or desires.[99] Codex Group, a marketing research firm, found that consumers browsing a traditional bookstore discover new books they would like to read at around

---

[92] Jordans & Italie.

[93] Porter Anderson, *US Publishers, Authors, Booksellers Call Out Amazon's 'Concentrated Power' in the Market*, Publishing Perspectives (Aug.17, 2020), https://publishingperspectives .com/2020/08/us-publishers-authors-booksellers-call-out-amazons-concentrated-power-inthebook-market/.

[94] George Packer, *Cheap Words*, New Yorker (Feb.17 & 24, 2014), https://www.newyorker.com/ magazine/2014/02/17/cheap-words.

[95] Amy Watson, Number of Independent Bookstores in the U.S. 2009-2019, Statista (Oct. 29, 2019), https://www.statista.com/statistics/282808/number-of-independent-bookstores-in-the-us/.

[96] Larry Light, The Barnes & Noble Buyout: A Godsend for Book Readers and Investors, Forbes (Jun. 24, 2019), https://www.forbes.com/sites/lawrencelight/2019/06/24/the-barnes-noblebuyout-a-godsend-for-book-readers-and-investors/?sh=70936407ef8f.

[97] Associated Press, *Borders Seeks to Liquidate All Stores*, Toledo Blade (July 18, 2011).

[98] *Supra* Day and Gu.

[99] Matt Day and Jackie Gu*, The Enormous Numbers Behind Amazon's Market Reach*, Bloomberg (Mar. 27, 2019), https://www.bloomberg.com/graphics/2019-amazon-reach-acrossmarkets/ (estimating that Amazon controls 88.9% of the eBooks market).

three times the rate compared when they are shopping on Amazon.[100]   Although Amazon is dominating the book market, it only accounts for around seven percent of new book discovery, while, alternatively, local bookstores are still holding on to twenty percent of new discoveries.[101]

66.     Certainly this is by design, as Amazon founder and former hedge fund manager, Jeff Bezos, did not simply start an online bookstore out of a passion for books. Shel Kaphan, Bezos's former deputy, expressed that Mr. Bezos's decision to start Amazon as a bookstore "was totally based on the property of books as a product."[102]   Books are durable for the shipping industry and there are way too many of them, in and out of print, to sell even a fraction of them at any physical store.[103]

67.     Amazon's eBook model could be classified as "a gateway drug."[104]   Amazon saw online book sales as a way to gather consumer data from educated shoppers much like what we see from Google today.   Former chief executive of Macmillan, John Sargent, explained that Amazon was never just a bookstore: "Books were going to be the way to get the names and the data. Books were [Amazon's] customer-acquisition strategy."[105]   Amazon would now be able to

---

[100] Stacy Mitchell and Olivia LaVecchia, Report: Amazon's Monopoly, ILRS (Nov 29. 2016), https://ilsr.org/amazons-monopoly/ at 27.
[101] *Id*.
[102] *Supra* Packer.
[103] *Id*.
[104] *Id*.
[105] *Id*.

figure out how to sell everything else based on the data of millions of their book-based customers.[106]

### C. EBooks Disrupted the Trade Publishing Industry

68.    Amazon Kindle became the first e-reader to gain widespread commercial acceptance after its 2007 launch, and even became the market leader in the sale of eBooks and eBook readers.[107]  By 2009, Amazon was selling almost ninety percent of all eBooks.  Amazon charged $9.99 for numerous new release and bestselling eBooks, forcing other eBook retailers to also charge $9.99 or less for eBook titles.[108]

69.    The Big Five was threatened by Amazon dictating the price point of eBooks. Specifically, publishers worried that the low prices of eBooks would influence book consumers to outgrow the pricing of hardcover books, which were usually priced at thirty dollars or more. Further, the Big Five feared Amazon would begin negotiating directly with authors and literary agents for rights.[109]  Ultimately, the Big Five concluded they needed to force Amazon to abandon its discounted pricing model.  Hachette stated that they needed keep Amazon's "wretched $9.99 price point [from] becoming a de facto standard."[110]  Macmillan called Amazon's pricing standards "book devaluation to $9.99" and Simon & Schuster claimed it was the "basic problem: how to get Amazon to change its pricing" and to move away from the $9.99 price point.[111]

70.    The Big Five publishers each reached out to Amazon in hopes of changing the low $9.99 price point.  During February 2009, Penguin expressed to Amazon that the pricing model

---

[106] *Id.*
[107] *Apple Inc.*, 952 F. Supp. 2d at 649.
[108] *Id.* at 649.
[109] *Id.*
[110] *Id.* at 650, 653.
[111] *Id.* at 650.

was "not a good sustainable one."[112]  HarperCollins told Amazon that it was "seriously considering changes to our discount structure and our digital list prices for all retailers."[113]  Additionally, Simon & Schuster warned Amazon that the price point was "a mistake" that was "terrible for the business."[114]  Finally in December 2009, Hachette explained that if Amazon would raise eBook prices by only a dollar or so, it would "solve the problem."[115]

71.    When the Big Five could not get Amazon to budge on its pricing, they looked to Apple and the iPad that Apple would be launching in 2010.[116]  The iPad would be a unique addition to the e-reader market because instead of simple black and white display screens, the iPad would offer illustrations and photographs in color as well as audio and video capabilities to  enhance the eBook reading experience.[117]

72.    During late 2009 and early 2010, the Big Five and Apple entered an agreement wherein the Big Five would have to adopt the agency model to raise retail prices while Apple would receive a 30% commission for facilitating the sales.  Apple also included an MFN clause in the agreements that required the Big Five to price their eBooks on Apple at or below the lowest price available in the market.  Apple thus enabled the Big Five to set the retail prices of their books, while at the same time guaranteeing that it would never have to compete on price.[118]

73.    They ultimately agreed to cap eBook prices at $12.99 for New Release titles with hardcover list prices of $30 or under, and set a $14.99 price tier cap for New Release titles with hardcover list prices above $30, with incremental price tier increases for every $5 increase in the

---

[112] *Id.*
[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] *Id.* at 654-655.
[117] *Id.* at 655.
[118] *Id.* at 658-62.

hardcover list price above $30. For books other than New Releases, the price cap was set at $9.99.[119] Notably, the revenue the Big Five would receive per eBook sold through the Apple store was substantially less than what they were currently receiving under their wholesale arrangements. But Apple played to Big Five's long-term interests in raising eBook prices to protect the prices of print books.[120]

74.     Amazon was then forced to accept the agency model, otherwise the Big Five threatened to withhold their eBooks for seven months following the release of the printed versions.[121]   Amazon filed a complaint with the FTC[122]; however, it still entered into agency agreements with the Big Five  by mid-2010.  In these agreements, Amazon was given the option to return to the wholesale model should a publisher agree to the model with any other eBook retailers.  Ultimately, the Big Five entered into agency model agreements with both Google and Barnes & Noble for sale of eBooks.

75.     EBook prices increased and Apple gained as much as 22% of the retail eBooks market within the first couple of months of this new sales platform.[123]   Although the Big Five actually lost eBook revenue, they were able to raise to price of print books, which made up for the decline.[124]

76.     In 2011,however, a price-fixing class action was filed by consumers in this District and the EU Commission simultaneously opened its own investigation.  Within a year, the DOJ and numerous Attorneys General filed enforcement actions.  The Big Five entered into consent decrees

---

[119] *Id*. at 667.
[120] *Id.* at 665.
[121] *Id*. at 679-680.
[122] *Id*. at 680-681.
[123] Marco Tabini, *Apple grabs 22 percent of e-book market with iBooks* Macworld (Jun. 7, 2010), https://www.macworld.com/article/1151813/ibooks.html.
[124] *Apple Inc*., 952 F. Supp. 2d at 683.

with the DOJ, which required them to end their agreements with Apple and other retailers that restricted the eBook retailers' ability to discount eBooks.[125]  Conversely, Apple proceeded to trial in this District and the Court found that Apple and the Big Five co-conspirators had carried out a *per se* illegal horizontal price-fixing scheme to eliminate price competition in the eBook market.[126] A $450 million judgment was entered against Apple.

77.     During a two-year period, the consent decrees required the Big Five to permit eBook retailers to discount prices and offer promotions encouraging consumers to purchase eBooks.  Further, the Big Five would not be able to enter into agreements with eBook retailers that contained MFN clauses governing prices for a period of five years.[127]  Similar provisions were also agreed to in the European proceeding.

78.     Subsequently, competitive pricing prevailed between 2013 and 2015; however, prices rose again as soon as the publishers renewed their agency agreements with Amazon.

**D.     Amazon Benefits from Inflated EBook Prices as a Trade Publisher**

79.     In part due to the friction between itself and the Big Five, Amazon established Amazon Publishing, which it now touts as "a leading publisher of commercial and literary fiction, nonfiction, and children's books."[128]

80.     Amazon claims that at least 36 of its authors have sold at least a million books.[129] Best-selling author Dean Koontz has a five-book deal with Amazon Publishing.[130]  One of

---

[125] *See*, e.g., Final Judgment Penguin, at 8-9.
[126] *Apple Inc*., 952 F. Supp. 2d at 694.
[127] Final Judgment Penguin, at 11, 18.
[128] Amazon Publishing, https://amazonpublishing.amazon/about-us.html.
[129] *Id*.
[130] Porter Anderson, *Dean Koontz's Jump to Amazon Publishing: Will Other Authors Follow?*, Publishing Perspectives (July 22, 2019), https://publishingperspectives.com/2019/07/bestsellerdean-koontz-jumps-to-amazon-publishing-fiveBook-deal-plus-stories/.

Amazon's imprints, Amazon Crossing, is the largest publisher of translated fiction in the United States.[131] Amazon currently operates sixteen imprints and has nine offices around the world.[132]

81.    Amazon thus benefits from the Big Five's high prices, which enable Amazon to charge higher prices for its own eBooks.

### E.    Amazon Adopts Anticompetitive Restraints to Protect its Platform from the Disadvantages of the Big Five's Inflated eBook Prices

82.    By virtue of its dominance of the retail market for eBooks, Amazon maintains substantial bargaining power with the Big Five. It could have maintained its ability to discount their eBooks, but instead agreed to let them set supracompetitive retail prices in exchange for high commissions and a guarantee that Amazon could not be undersold by its competitors.

83.    According to the House Judiciary Committee, Amazon has at all times used MFNs or their equivalents in its agreements with trade publishers.[133] The EU Commission determined that even when the Big Five were nominally prohibited from having MFNs in their contracts, they evaded that restriction in dealing with Amazon by using notification provisions that had the same effect.[134]

84.    No matter the means, Amazon's objective has always been to prevent "publishers from partnering with any of Amazon's competitors" and to reinforce "Amazon's 'stranglehold' and 'control' over book distribution."[135] Amazon has acquired and maintained its monopoly power in large part through these restraints.[136] Its competitors lack any incentive to offer promotional

---

[131] Ed Nawotka, *Translations Pay off For Amazon*, (Nov. 8, 2019) Publisher's Weekly, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/81707-translations-pay-off-for-amazon.html.
[132] Amazon Publishing.
[133] House Report at 295-296.
[134] 5.4.2017 EU Commission Decision at 11.
[135] House Report at 295-296.
[136] *Id*.

advantages or alternative business models to gain market share because Amazon requires that the Big Five grant it whatever opportunities they offer to Amazon's competitors.[137] The result is reduced innovation and supracompetitive retail prices.[138]

**F.      Amazon is Under Government Investigation for Possible Antitrust Violations**

85.      The EU Commission investigated Amazon's contracts with eBook publishers between 2015 and 2017.  The Commission cited numerous issues relating to Amazon's MFNs and notification clauses, finding that Amazon used these clauses to restrain its competitors' market shares and discourage potential competitors from entering the market.

86.      The House Judiciary Committee began an investigation in 2019 that entailed seven hearings on digital markets, addressed to issues including data privacy, innovation, free speech, and competition. Pursuant to that investigation, the Committee requested documents and information regarding Amazon's market share and competitors in numerous markets.[139]

87.      The Committee issued a report in October 2020. It concluded that Amazon "serves as a gatekeeper over a key channel of distribution," the domestic online retail market,[140] and that by controlling access to that market, it abuses its tremendous power "by charging exorbitant fees, imposing oppressive contract terms, and extracting valuable data from the people and businesses that rely on" it.[141] It also "uses its gatekeeper position to maintain its market power and "to further

---

[137] 5.4.2017 EU Commission Decision at 20-38, 43.

[138] *Id.*

[139] Letter from U.S. House of Representatives Committee on the Judiciary to Jeff Bezos, Amazon CEO (Sept. 13, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/amazon%20rfi%20-%20signed.pdf.

[140] House Report at 6, 15.

[141] *Id.* at 6.

entrench and expand" its dominance.[142] The Committee compared Amazon's conduct to "the kinds of monopolies we last saw in the era of oil barons and railroad tycoons."[143]

88.     Amazon also faces an investigation by the Federal Trade Commission and antitrust scrutiny by state attorneys general offices in California, Washington, and New York,[144] in addition to the recently-disclosed Connecticut investigation addressed strictly to eBooks.

## VII.   ANTITRUST IMPACT

89.     Amazon's and its co-conspirators' conduct described herein has substantially impaired competition in the retail eBook market.

90.     Amazon's and its co-conspirators' conduct described herein lacks any procompetitive justification. Moreover, the harm to competition and the resulting antitrust injury suffered by Plaintiff and Class members more than offsets any purported procompetitive justifications Amazon may offer.

## VIII.  ANTITRUST INJURY

91.     Amazon increases the prices of eBooks offered by its competitors, restrains consumer choice, and otherwise causes antitrust injury to retail eBook purchasers in the form of overcharges. Plaintiff and Class members have sustained, and continue to sustain, significant losses from overcharges directly attributable to Amazon's anticompetitive activity. Plaintiff will calculate the full amount of such overcharge damages after discovery and upon proof at trial. Unless Amazon's anticompetitive conduct is enjoined, Plaintiff and Class members will continue

---

[142] *Id.*
[143] *Id.*
[144] House Report at 253; Press Release, Fed. Trade Comm'n, FTC to Examine Past Acquisitions by Large Technology Companies (Feb. 11, 2020), https://www.ftc.gov/news-events/pressreleases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

to incur overcharges in their direct purchases of the Big Five's eBooks from Amazon's competitors.

92.   Plaintiff and Class members are direct purchasers who purchase the Big Five's eBooks through retail platforms that compete with Amazon, at prices inflated by Amazon and its co-conspirators' agreements detailed herein.

93.   Because of the agency model, Plaintiff and Class members overpay whether they buy the Big Five's eBooks directly from the Big Five on their own websites, or through retail eBook platforms that compete with Amazon. As required by the MFNs and similar clauses described herein, the Big Five sell at retail prices that are equal to or higher than the prices at which they sell their eBooks on Amazon. It is in the Big Five co-conspirators' independent economic self-interests to expand their market shares of retail sales and diversify their distribution. It would serve their independent interests to allow Amazon's competitors to develop alternative business models that benefit both consumers and the Big Five. Offering Amazon's competitors special edition or enhanced eBooks would attract new customers, increase sales, reduce the Big Five's dependency on Amazon, and limit Amazon's market power. But Amazon and the Big Five do not consider those options, so as to preserve the supracompetitive prices of the Big Five's eBooks. Plaintiff and Class members who purchase directly from the Big Five through Amazon's competitors are harmed because they pay prices raised, fixed, maintained, or stabilized by Amazon and the Big Five, without the benefit of discounts, promotions, and potentially lower-cost alternative business models that would exist in a competitive market.

94.   Because Amazon continues to enforce its anticompetitive MFNs and similar restrictive provisions, Plaintiff and Class members will continue to incur overcharges for the Big

Five's eBooks. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly attributable to Amazon's violations of antitrust laws as alleged herein.

## IX.    INTERSTATE TRADE AND COMMERCE

95.    During the relevant time period, Defendant facilitated the sale of the Big Five's eBooks across, and without regard to, state lines.  The Big Five co-conspirators also sell their eBooks throughout the United States in interstate trade and commerce.  Defendant's acts as alleged in this complaint were within the flow of, and substantially affected, interstate commerce.

## X.    MARKET DEFINTION

96.    The antitrust injuries alleged herein, including harm to consumers, have occurred in the United States retail market for trade eBooks.  Amazon and its co-conspirators agreed upon price restrains that unreasonably restrain these markets.  Plaintiff seeks relief on behalf of herself and on behalf of other retail purchasers who purchase trade eBooks from one or more of the Big Five co-conspirators through electronic platforms other than Amazon.com.

97.    Amazon's restraints on competition directly impact the United States retail market for trade eBooks.

98.    Trade books comprise a product market distinct from non-trade books, such as reference and academic books.[145]  The trade book market can also be distinguished from self-published books.  Whereas a self-published author incurs all the costs and is responsible for content and marketing, trade publishers receive the rights to sell authors' books in exchange for editing, publishing, marketing, and distributing those books.[146]  Trade publishers are extremely selective. They do not read roughly 95% of the manuscripts they receive and publish only about 1% of the

---

[145] *Apple Inc.*, 952 F. Supp. 2d at 648 n.4.
[146] Leigh Shine, *Calculating the Odds of Getting a Traditional Publisher*, Medium (Dec. 22, 2016), https://medium.com/publishizer/calculating-the-odds-of-getting-a-traditional-publisher798b1c7b94b0.

manuscripts they do review.[147]  The selection, editing, and promotional process is expensive, and trade books reflect a publisher's investment in that process.

99.     Within the trade book market, there is also a distinct product market for the retail sale of trade eBooks that is separate from the retail sale of trade print books and trade audio books.[148]

100.    Products' functional interchangeability typically depends on their physical characteristics.[149]  EBooks are digital products for visual reading.  Their physical characteristics differ from those of print books.  They are also different from audio books, which may be physical or digital but are made for listening, and not visual reading.  These distinctive characteristics place print books and audiobooks outside of the markets for eBooks.[150]

101.    From a supply side and demand side analysis, trade print books and trade audiobooks are not sufficiently strong substitutes to warrant inclusion in the same product market as trade eBooks.[151]

102.    The EU Commission determined that consumers are unlikely to switch from eBooks to print versions in the case of a 5-10% increase in the retail of eBooks, because eBooks would still generally be priced significantly lower than print books.[152]  The EU Commission's investigation of the eBook market revealed that consumers will purchase eBooks instead of a print version for reasons including the following: (i) eBooks are easier to carry when traveling than print

---

[147] Odds of Being Published - Fiction Writer's Mentor, http://www.fiction-writersmentor.com/odds-of-being-published.
[148] *Apple Inc.*, 952 F. Supp. 2d at 694 n.60 (defining the relevant market as trade eBooks in the United States); 5.4.2017 EU Commission Decision at 14.
[149] 2 Federal Antitrust Law § 10.2 (2020).
[150] 5.4.2017 EU Commission Decision at 14.
[151] *Id*.
[152] *Id*.

books; (ii) eBooks have functionalities not available in print books, such as the ability to change the type and size of fonts; (iii) eBooks can support interactive features including video or music add-ons, dictionaries, and links to information regarding the text or author; and (iv) eBook can be purchased and downloaded for immediate use at any time.[153]  The EU Commission also added that a substantial amount of titles are only, or more readily, available in the eBook format.[154]

103.    To find significant supply-side substitutability, print book retailers and eBook retailers would have to be able to enter each other's markets quickly and easily.  The EU Commission determined this was not possible.  The distribution of print books entails substantial investments in warehousing and logistics, whereas eBook distribution requires establishment and maintenance of an online distribution platform.[155]  A standard print bookstore cannot switch from selling print books to eBooks without acquiring significant tangible and intangible assets incurring additional investments and making significant strategic decisions.  The same holds true for eBook retailers switching to print sales.[156]

104.    The EU Commission found that audio books are distinct from both print books and eBooks, notably in terms of (i) pricing at wholesale and retail level and (ii) their typical end consumer and mode of consumption.[157]  Because print books and audio books are not reasonable substitutes, the retail eBook market is a distinct market.

105.    The Big Five co-conspirators sell their eBooks throughout the United States.  The relevant geographic market is the United States.

---

[153] *Id.*
[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] *Id.*

## XI.     CLAIM ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

106.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each of the paragraphs set forth above.

107.    Plaintiff brings this claim on her own behalf and on behalf of the proposed Class described above.  Plaintiff seeks damages and injunctive relief.

108.    In violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Amazon and the Big Five Co-conspirators engaged in various anticompetitive MFNs and anticompetitive provisions that functioned the same as MFNs, thereby fixing and raising the prices of trade eBooks.

109.    Such anticompetitive agreements have an open and obvious adverse effect on competition.  They ensure that Amazon.com faces no competition in the price or availability of trade eBooks, no competition from other competing business models, and no competition from retailers that support enhanced eBooks that have features unavailable to Amazon's Kindle eReaders.  By restraining Amazon's eBook competitors from offering superior products or superior prices, Defendant increases the market price of the Big Five's eBooks and limits the potential choices retail consumers have in the sale of these eBooks.

110.    Defendant and its co-conspirators' anticompetitive agreements have actual detrimental effects including less competitive pricing and great product conformity.

111.    Defendant and its co-conspirators did not act unilaterally or independently, or in their own economic interests, when entering into these agreements, which substantially, unreasonably, and unduly restrain trade in the relevant market, and harmed Plaintiff and Class members thereby.  There is no legitimate, pro-competitive business justification for Defendant's anticompetitive agreements or any justification that outweighs their harmful impact.  Even if there

were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

112.    Plaintiff and Class members have been injured and will continued to be injured by paying more for the Big Five's trade eBooks than they would have paid or will pay in the future if it were not for Amazon's unlawful acts.  Plaintiff and Class members are entitled to injunctive relief to terminate the ongoing violations alleged in this complaint and to recover three times the amount of their overcharge damages caused by Amazon's unreasonable restraint of trade.

## XII.   CLAIM TWO

## VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2

113.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each of the paragraphs set forth above.

114.    Plaintiff brings this claim on her own behalf and on behalf of the proposed Class described above.  Plaintiff seeks damages and injunctive relief.

115.    Amazon conspired with the Big Five co-conspirators to monopolize the United States retail market for trade eBooks.

116.    Defendant possesses market power in the relevant market, where it controls about 90% of trade eBook sales. That Defendant has market power is also evident from its power to raise trade eBook prices above those that would be charged in a competitive market.

117.    By conspiring with the Big Five, Amazon has been able to maintain its monopoly power in the relevant market through unlawful and improper means such as preventing retail rivals from obtaining market share and preventing potential rivals from entering the market.  Amazon entered into anticompetitive agreements with the Big Five co-conspirators with the intent and effect of (i) guaranteeing that the Big Five's eBooks sold through Amazon's eBook rivals were

sold at prices at least as high as Amazon's prices; (ii) preventing Amazon's current and potential eBook competitors from offering price promotions or early releases; (iii) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models; (iv) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop innovative eBook products with greater functionality, such as illustrations.

118.    Plaintiffs and Class members are direct purchasers because they directly purchase eBooks from the Big Five co-conspirators through a U.S. ecommerce retail channel that competes with the Amazon.com platform.

119.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for the Big Five co-conspirators' eBooks than they would have paid or will pay in the future in the absence of Defendant's unlawful acts.

120.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff and proposed Class pray for relief as set forth below:

1.    Certification of the  Class pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative for the Class;

2.    That acts alleged herein be adjudged and decreed to be *per se* unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

3.    That acts alleged herein be adjudged and decreed to be unlawful monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

4.    That  judgment be entered against Defendant for the damages sustained by Plaintiff and the Class defined herein and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

5.     That   Defendant be enjoined from continuing the anticompetitive practices described herein;;

6.     That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

7.     That Plaintiff and the Class be awarded the costs of this suit, including attorneys' fees; and

8.     Such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and all others similarly situated, hereby requests a jury trial,

pursuant to Federal Rule of Civil Procedure 38, on  all claims so triable.

DATED:  February 10, 2021

_____

Neil L. Glazer
William E. Hoese
Douglas A. Abrahams
Zahra R. Dean
**KOHN, SWIFT & GRAF, P.C.**
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
Facsimile: (215) 238-1968
nglazer@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com
zdean@kohnswift.com

Michael L. Roberts
Morgan Hunt
**ROBERTS LAW FIRM US, PC**
1920 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (501) 821-5575
Facsimile: (501) 821-4474
mikeroberts@robertslawfirm.us
morganhunt@robertslawfirm.us

Gary M. Klinger
**MASON LIETZ & KLINGER, LLP**
227 W. Monroe Street, Suite 2100
Chicago, IL 60630
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
gklinger@masonllp.com

*Counsel for Plaintiff*